## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JASON A. WHITE, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  5:14-cv-00445-MHH** |
| | } | |
| CITY OF ATHENS, WILLIAM R. | } | |
| MARKS, FLOYD JOHNSON, | } | |
| TRACY HARRISON, REED | } | |
| WAYNE HARPER, and TREVOR | } | |
| HARRIS, | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

### I.    Introduction

This case is before the Court on the defendants' motion to dismiss.  Jason A. White claims the defendants retaliated against him for exercising his right to free speech under the First Amendment.  Mr. White, a former member of the Athens Police Department, acted as a source for media reports concerning improprieties within the police department and expressed to his superiors support for the independent investigation of other officers.  The defendants argue that Mr. White has failed to adequately allege legal bases for holding them liable for any purported retaliatory employment action.  For the reasons discussed below, the Court will grant in part and deny in part the defendants' motion to dismiss.

## II.    <u>**Standard of Review**</u>

Rule 8(a)(2) of the Federal Rules of Civil Procedure states that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "Generally, to survive a [Rule 12(b)(6)] motion to dismiss and meet the requirement of Fed. R. Civ. P. 8(a)(2), a complaint need not contain 'detailed factual allegations,' but rather 'only enough facts to state a claim to relief that is plausible on its face.'"   *Maledy v. City of Enterprise*, 2012 WL 1028176, at \*1 (M.D. Ala. March 26, 2012) (citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).   "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"   *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

"Thus, the pleading standard set forth in Federal Rule of Civil Procedure 8 evaluates the plausibility of the facts alleged, and the notice stemming from a complaint's allegations."   *Keene v. Prine*, 477 Fed. Appx. 575, 583 (11th Cir. 2012).   "Where those two requirements are met . . . the form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to

2

categorize correctly the legal theory giving rise to the claim." *Id.* When deciding a motion to dismiss, the Court must assume the truth of the factual allegations in the complaint and view those allegations in the light most favorable to the plaintiff. *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1169 (11th Cir. 2014).

In assessing the sufficiency of a complaint, the Court may consider only "the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). In accordance with Federal Rule of Evidence 201 and the Court's previous ruling, the Court will take judicial notice of the City of Athens Code of Ordinances and the City of Athens Personnel Policies and Procedures. (Doc. 32); Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

## III.   **Factual and Procedural Background**

The City of Athens hired Jason White in April 1999 as a police officer in the Athens Police Department. (Doc. 25, ¶ 12). Mr. White served with distinction, and the police department promoted him to sergeant in June 2005. (Doc. 25, ¶¶ 13–15). Shortly after his promotion, Mr. White became the supervisor of the department reserve unit. (Doc. 25, ¶¶ 17–20). Mr. White transferred to the general

investigations unit as a detective sergeant in July 2006 and began to learn about some of the police department's "unsavory secrets." (Doc. 25, ¶¶ 21–23).

In the summer of 2009, the Athens Police Department was rocked by scandal. (Doc. 25, ¶ 24). Tracy Harrison, then a captain in the police department, "covered up a DUI arrest made by the Department" after he received a call from the arrestee's attorney. (Doc. 25, ¶¶ 24, 25). Captain Harrison deleted police department records; used a police car to pull over a U.S. mail carrier to obtain and destroy records that were en route to the Alabama Department of Public Safety; and asked arresting officer Jason Threet to lie about the arrest. (Doc. 25, ¶¶ 24–28). Captain Harrison enlisted the help of Officer Threet and Lieutenant Pressnell to assist in the cover up, after which Officer Threet was promoted to sergeant. (Doc. 25, ¶¶ 26–29). The Alabama Attorney General's Office investigated these incidents, and Chief of Police Harper formally reprimanded Captain Harrison and Officer Threet. (Doc. 25, ¶¶ 30–32).

As the scandal unfolded, Mr. White communicated with *Decatur Daily* reporter Holly Hollman about the police department's cover-up of the Harrison corruption scandal and another incident involving a DA investigator fighting in public. (Doc. 25, ¶ 33). Local officials were not happy that an insider had contacted the media about the scandal. Mr. White met with Athens City Council

President William R. Marks[1] in Mr. Marks's home in the fall of 2009.  (Doc. 25, ¶¶ 35–38).  Mr. Marks told Mr. White that "whoever called the media [regarding the Harrison scandal] . . . [was] looking at serious trouble."  (Doc. 25, ¶ 39).   Two weeks after Mr. White met with Mr. Marks, Chief Harper and Lieutenant Floyd Johnson interrogated all police department investigators to determine who reported Captain Harrison to the Alabama Attorney General's Office and the media.  (Doc. 25, ¶ 40).

In 2010, Chief Harper interrogated Mr. White again about Mr. White's knowledge of and dealings with local reporters.  (Doc. 25, ¶ 41).   During the interrogation, Mr. White stated that he supported reporting Captain Harrison's actions.  (Doc. 25, ¶ 45).  Lieutenant Johnson attended the interrogation.[2]  (Doc. 25, ¶ 42).

Soon after this meeting, the police department retaliated against Mr. White by removing him from his supervisory position in the police department's honor guard.  (Doc. 25, ¶ 49).  Mr. White was removed from his supervisory position even though Chief Harper stated Mr. White had performed satisfactorily.  (Doc. 25, ¶¶ 50–51).  In January 2011, Mr. White was transferred from the investigations

---

[1] Mr. Marks now serves as the Mayor of Athens.  (Doc. 25, ¶¶ 35–38).

[2] Mr. Johnson is now the police chief of the Athens Police Department.  (Doc. 25, ¶ 43).

division and assigned to the day shift as a patrol sergeant, a demotion that left him under Captain Harrison's supervision.  (Doc. 25, ¶¶ 53–55).

Mr. White's ex-wife visited the Athens Police Department to lodge a complaint against Mr. White in April 2011.[3]  (Doc. 25, ¶ 58).  She accused Mr. White of using his status as a police officer against her during their recent divorce proceedings, an accusation he denies.  (Doc. 25, ¶¶ 58–60).  Lieutenant Harris, Chief Harper, Captain Harrison, and Lieutenant Johnson questioned Mr. White's ex-wife and initially focused, not on the complaint, but on Mr. White's possible involvement in reporting the Harrison corruption scandal.  (Doc. 25, ¶¶ 61–65).

Following the meeting with Mr. White's ex-wife, the defendants devised a plan to retaliate against Mr. White under the guise of routine discipline.  (Doc. 25, ¶¶ 66–67).  The defendants initiated an investigation into Mr. White's alleged misconduct.  Mr. White became aware of the investigation in June 2011 during a custody proceeding.  (Doc. 25, ¶¶ 68–69).  When Mr. White and his counsel confronted Chief Harper about the investigation, Chief Harper told Mr. White about the complaint filed by White's ex-wife and informed him that "the office thought little of the potential offense" and that the "allegations were deemed to have little merit."  (Doc. 25, ¶¶ 70–72).  Chief Harper assured Mr. White that it was very common for spouses involved in divorces or custody disputes to file

---

[3] Mr. White's ex-wife conveyed the details of this visit to Mr. White on or about April 20, 2012. (Doc. 25, ¶ 91).

complaints for officer misconduct like the one filed by Mr. White's ex-wife, which alleged that Mr. White "r[an] a license plate of an unknown vehicle for non-law-enforcement purposes." (Doc. 25, ¶ 73).

On July 28, 2011, an agent of the Alabama Criminal Justice Information Center (ACJIC) told Mr. White that he was under investigation. (Doc. 25, ¶ 74). Mr. White contacted a district attorney the following day to ask if he had broken the law, and district attorney Brian Jones replied that Mr. White likely had not broken the law and that the investigation against him "was obviously a 'witch hunt' based on [Mr. White's] knowledge of the Harrison corruption scandal." (Doc. 25, ¶ 76).

During the summer of 2011, Mr. White visited Lieutenant Harris's office to ask about the status of a National Crime Information Center (NCIC) investigation into Mr. White's offense. (Doc. 25, ¶ 77). While Lieutenant Harris told Mr. White that he wanted to hear White's side of the story, he also informed him that only Chief Harper and Mr. Marks, who had recently been elected mayor, were allowed to speak with White about the matter. (Doc. 25, ¶¶ 78–79). Lieutenant Harris was surprised to hear that Chief Harper had previously discussed the investigation with Mr. White dismissively. (Doc. 25, ¶ 81). Mr. White told Lieutenant Harris that no one at the police department had asked White for information and implied that the investigation had been motivated by White's involvement in bringing Captain

7

Harrison's actions to light.  (Doc. 25, ¶¶ 80, 82).  Lieutenant Harris responded: "What happened with [] Tracy [Harrison] . . . should have been kept confidential." (Doc. 25, ¶ 83).  Mr. White believed Lieutenant Harris spoke with the understanding that the investigation against White was in retaliation for White's involvement with the Harrison scandal.  (Doc. 25, ¶¶ 82–83).

In early 2012, Mr. White discussed the NCIC complaint against him with Floyd Johnson, the interim police chief.  (Doc. 25, ¶¶ 84–85).  During the conversation, Chief Johnson confirmed White's suspicion that Captain Harrison "had been a part of initiating the complaint against, and investigation of, [Mr. White]." (Doc. 25, ¶¶ 86–87).

ACJIC agent Lynn Shobe interviewed Mr. White on April 11, 2012, nearly a year after the investigation was opened.  (Doc. 25, ¶ 88).  Agent Shobe told Mr. White that the case had "just fallen out of the sky onto his desk" and that White would probably be reprimanded through sanctions and some retraining, a common disciplinary response to similar conduct.  (Doc. 25, ¶¶ 89–90).

The police department suspended Mr. White from the NCIC system and then terminated him on May 1, 2012 because without access to the NCIC system, he could not perform the duties of a police officer.  (Doc. 25, ¶¶ 92–93).  Chief Johnson approved the ACJIC recommendation to suspend Mr. White's NCIC

privileges, and Mayor Marks signed off on Mr. White's termination.  (Doc. 25, ¶¶ 92–94).

Mr. White alleges the department used discipline for misuse of the NCIC system as a pretext to fire him for his protected activity.  (Doc. 25, ¶¶ 95–96).  As support for this assertion, Mr. White points to the many other officers who have engaged in the same—and even more egregious—conduct without being disciplined in the same manner.  (Doc. 25, ¶¶ 97, 99).  Mr. White contends that Chief Harper and Lieutenant Pressnell both used the NCIC database to run tags for non-law enforcement purposes but were not disciplined.  (Doc. 25, ¶¶ 97, 98, 104, 105).  Mr. White also claims other officers have not been disciplined for improper conduct, such as having sex with a prostitute in custody, illegally entering an agreement to release an arrestee, and falsifying work hours.  (Doc. 25, ¶¶ 99–103).  Mr. White alleges that the City of Athens and the individual defendants had knowledge of these other, unpunished instances of misconduct.  (Doc. 25, ¶¶ 104–106).  Mr. White claims that the City's "pattern and practice of selectively enforcing its own rules and regulations" allows the City and police department to "terminate employees based on improper considerations," like the protected conduct in which Mr. White engaged.  (Doc. 25, ¶ 107).

IV. **Discussion**

### A. Section 1983 First Amendment Retaliation Claims

Mr. White alleges that "the Defendants intentionally and willfully retaliated against [him] for his speech that was protected under the First Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983."  (Doc. 25, ¶ 110).  Title 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

As an initial matter, Mr. White's claims against the defendants under § 1983 depend upon an adequate showing that Mr. White was deprived of a right secured by the Constitution.  If the facts as stated in the complaint show that Mr. White's termination violated his First Amendment rights, the Court will address whether Mr. White has presented a plausible legal rationale for holding the defendants liable for that violation.

## 1.    First Amendment Violation

A government employer may not discharge a public employee for speech protected by the First Amendment.  *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013).  The Court evaluates First Amendment retaliation claims using a four-part test; three parts of which are relevant to the defendants' motion to

dismiss.[4]  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015). The Court first considers "whether Plaintiff's speech was made as a citizen and whether it implicated 'a matter of public concern.'"   *Id.* at 618 (quoting *Carter*, 731 F.3d at 1168–69).  If those requirements are satisfied, the Court must "weigh Plaintiff's First Amendment interests against the City's interest in regulating his speech to promote 'the efficiency of the public services it performs through its employees.'"  *Id.* (quoting *Carter*, 731 F.3d at 1168).  If the First Amendment interest prevails, the plaintiff must show that the protected speech "was a substantial motivating factor in his termination."  *Id.*

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Conversely, statements made "by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes . . . ."  *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014).   Mr. White was not a spokesperson or public relations officer for the Athens Police Department—and he was not speaking on the department's behalf or at its behest—when he reported allegations of corruption within the department to

---

[4] If the plaintiff satisfies the first three parts of the test, the final step of the analysis shifts the burden to the defendant to show that it would have terminated the plaintiff even in the absence of the protected speech.  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).

the media.  Mr. White's contact with members of the press did not occur in the course of his ordinary job duties, and the complaint provides a reasonable basis to infer that Mr. White's statements to the press were not made at work.  (*See* Doc. 25, ¶¶ 39–44, 61–65); *Cf. Garcetti*, 547 U.S. at 420 ("Employees in some cases may receive First Amendment protection for expressions made at work.")  Mr. White's statements do relate to matters that came to his attention through his employment as a police officer, but "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."  *Lane*, 134 S. Ct. at 2379. Therefore, Mr. White has alleged facts that show he was speaking in his capacity as a citizen when he discussed potential corruption within the Athens Police Department.

Next, the Court must determine if Mr. White's speech implicated a matter of public concern.  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and internal quotation marks omitted).  Illegal conduct by members of the Athens Police Department would certainly be a matter of concern for the community the department serves, particularly if that conduct

involved or was sanctioned by the department's leadership. *See Lane*, 134 S. Ct. at 2380 ("The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern."); *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996) ("Certainly, the question of whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political or social concern.").  Mr. White sufficiently alleged that his speech implicated a matter of public concern.

The final step in the analysis of whether First Amendment protection applies to the statements made by Mr. White requires the Court to strike "'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (alteration in original) (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568 (1968)).  Not all First Amendment interests demand the same level of protection, and "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick v. Myers*, 461 U.S. 138, 150 (1983).  Pertinent considerations include "whether the statement impairs discipline

13

by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. The circumstances of an employee's speech are also relevant because "the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 418 n. 4 (1979). Because Mr. White brought instances of misconduct to the public's attention, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004).

Mr. White does not offer much detail concerning his communications with members of the press or other potentially protected activity, but certain reasonable inferences may be drawn from the complaint. (*See* Doc. 25, ¶¶ 33–48). The efforts undertaken by Mr. White's superiors to discover if members of the Athens Police Department had been in contact with the media indicate that Mr. White's communications were discrete and did not cause a disruption or attract attention because of the time, place, or manner in which they occurred. (Doc. 25, ¶¶ 40–41). The complaint does indicate that the Athens Police Department experienced a

certain degree of turmoil when allegations of misconduct within the department became public. (Doc. 25, ¶¶ 38, 48). However, based on the allegations of the complaint, the disruption of the department's operations and damage to morale could be attributed to the department's efforts to identify whistleblowers or officers' perception of corruption within the department, not Mr. White's speech. At this stage in the proceedings, the Court must answer that question in Mr. White's favor.

The Court must also weigh against any impairment of the efficiency of the Athens Police Department the fact that Mr. White's speech was aimed at exposing conduct by fellow officers that flouted the department's obligation to enforce the law. It would turn First Amendment precedent on its head to require employees to remain silent about public corruption because speaking up might cause a scandal. *See Connick* , 461 U.S. at 145 ("Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) ("[A] core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption."). After carefully weighing the competing interests of Mr. White and the Athens Police

Department, the Court concludes that on the facts presented in the complaint, Mr. White's speech is entitled to protection under the First Amendment.

Having shown, for purposes of the instant motion to dismiss, that he engaged in protected speech, Mr. White also must "show that [his speech] was a substantial motivating factor in his termination." *Moss*, 782 F.3d at 618. Mr. White meets this burden at the pleading stage by alleging that other officers who engaged in prohibited conduct—but not protected speech regarding corruption in the Athens Police Department—were not disciplined as severely as he was. (Doc. 25, ¶¶ 97–107).

Chief Johnson suspended Mr. White's NCIC privileges on the recommendation of the ACJIC, which investigated the allegation that Mr. White had used the NCIC system to run a car tag for non-law enforcement purposes. (Doc. 25, ¶¶ 68–74, 92). Mr. White was then terminated because he could not perform his duties without access to the NCIC system. (Doc. 25, ¶¶ 92–93). In his complaint, Mr. White alleges that when other officers, including Chief Harper and Lieutenant Pressnell, used the NCIC system for non-law enforcement purposes, they were neither investigated nor disciplined. (Doc. 25, ¶ 97). In addition, according to Mr. White, the department did not terminate officers who had engaged in serious misconduct such as having sex with prostitutes being held in

custody, improperly releasing arrestees without contacting prosecutors, and falsifying time sheets. (Doc. 25, ¶¶ 100–03).

The purported disparity between the discipline meted out to Mr. White and the discipline faced by other officers raises the inference that Mr. White was terminated not because of his alleged infraction, but because he spoke out on issues the department would have preferred to keep quiet. (*See* Doc. 25, ¶ 83). According to Mr. White, Lieutenant Harris and Chief Johnson confirmed that the investigation into Mr. White's use of the NCIC system was in retaliation for Mr. White's involvement in reporting Captain Harrison's misconduct. (Doc. 25, ¶¶ 82–83, 86–87). Thus, Mr. White has alleged facts that, if proven, would show that his termination violated the First Amendment.

### 2.   City of Athens

To state a valid claim against the defendants, Mr. White also must show that the defendants may be held liable for that violation. The City contends that Mr. White has failed to meet the burden imposed by *Monell v. Dep't of Soc. Serv's*, 436 U.S. 658, 694 (1978), and its progeny, which preclude § 1983 liability for municipalities unless an official policy caused the violation. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Mr. White attempts to satisfy this pleading requirement by alleging that the City has a pattern and practice of selectively enforcing its police department policies, which caused a violation of Mr. White's

17

First Amendment rights; and the City violated Mr. White's First Amendment rights through its "chief decision makers," Mayor Marks and Police Chief Johnson. (Doc. 25, ¶¶ 115–118).

Mr. White's allegations have as a backdrop the general principle that "[m]unicipal liability is limited 'to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered.'" *Carter*, 731 F.3d at 1166 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

The law relating to Mr. White's pattern and practice theory is clear: "a 'persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a[n] [unconstitutional] "custom" . . . that can subject the government to liability.'" *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (alterations in original) (quoting *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n. 12 (11th Cir. 2001) *cert. granted, judgment vacated sub nom. Thomas v. Roberts*, 536 U.S. 953 (2002), *opinion reinstated*, 323 F.3d 950 (11th Cir. 2003)). However, "[i]t is not sufficient for a government body's policy to be tangentially related to a

constitutional deprivation.  The 'official policy or custom must be the moving force of the constitutional violation in order to establish liability of a government body under § 1983.'"  *Cuesta v. Sch. Bd. of Miami-Dade Cty., Fla.*, 285 F.3d 962, 967 (11th Cir. 2002) (quoting *Gilmere v. City of Atlanta, Ga.*, 737 F.2d 894, 901 (11th Cir. 1984) *on reh'g*, 774 F.2d 1495 (11th Cir. 1985)).

Mr. White alleges the City selectively investigated and disciplined officers accused of misconduct and that this selective enforcement constituted a pattern and practice that led to his termination for engaging in protected speech.  (Doc. 25, ¶¶ 107, 116–17).  But Mr. White fails to supply a causal link between the City's non-enforcement policy and the violation of his First Amendment rights.  If the City has failed to punish, or even investigate, other members of the Athens Police Department for misuse of the NCIC system, improper contact with detainees, or falsification of department records, the City perhaps has encouraged or ratified those activities, but the misconduct the City allegedly has fostered and the constitutional violation Mr. White purportedly has suffered are not connected.  The police department's selective discipline lends credence to Mr. White's claim that the stated reason for his dismissal was pretextual, but Mr. White has not alleged facts that suggest the department's selective discipline was the moving force behind the injury he suffered.  If Mr. White hoped to demonstrate that he was lulled into believing that use of the NCIC system for personal reasons would not

result in disciplinary action, he still would have to show how the practice that led to his belief caused the violation of his First Amendment rights.  Mr. White has not made the requisite showing, and his pattern and practice theory of municipal liability is due to be dismissed.

Mr. White's policymaker theory fares better than his pattern and practice theory.  "[W]hether a particular official has final policymaking authority is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (emphasis in original) (internal quotation marks omitted) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)).  In the context of § 1983, state law includes "state and local positive law, as well as custom or usage having the force of law . . . ." *Id.* (internal quotation marks omitted) (quoting *Praprotnik*, 485 U.S. at 174 n. 1).  "[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997).  But "[a] municipality can be liable when 'a series of decisions by a subordinate official manifest[s] a "custom or usage" of which the supervisor must have been aware.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994) (quoting *Praprotnik*, 485 U.S. at 130).

Before a case is submitted to a jury, "the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett*, 491 U.S. at 737 (internal citation and quotation marks omitted).   However, "identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement.'" *Hoefling v. City of Miami*, No. 14-12482, 2016 WL 285358, at *7 (11th Cir. Jan. 25, 2016) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002)).

Mr. White asserts that Mayor Marks and Chief Johnson acted as the chief decision makers for the City when they terminated his employment.   (Doc. 25, ¶ 115).   The City has attempted to rebut that assertion by submitting the code of ordinances and the personnel policies and procedures of the City of Athens for the Court's consideration.   (Doc. 29).   Given the current posture of the case, it would be inappropriate for the Court to decide this issue solely on the basis of the City's submissions.   Mr. White's allegations that Chief Johnson suspended Mr. White's NCIC privileges and recommended his termination and Mayor Marks approved Mr. White's termination plausibly suggest that Chief Johnson and Mayor Marks acted with final policymaking authority regarding the discipline imposed on Mr. White.   (Doc. 25, ¶¶ 92–94); *see Salvato v. Miley*, 790 F.3d 1286, 1295 (11th Cir.

21

2015) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.") (brackets omitted) (quoting *Praprotnik*, 485 U.S. at 127). The City might prevail on this argument on summary judgment or at trial by demonstrating that the decisions of Mayor Marks and Chief Johnson were subject to meaningful administrative review, but that is an argument for another day. Under *Hoefling*, Mr. White must have the opportunity to develop evidence that supports the allegations in the complaint.

### 3.   Individual Defendants

The individual defendants urge the Court to dismiss Mr. White's claims against them on the basis of qualified immunity. "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane*, 134 S. Ct. at 2381 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). To hold a government officer responsible in his personal capacity, the plaintiff must show that "the official violated a statutory or constitutional right," and "the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 131 S. Ct. at 2080 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is clearly established when the state of the law at the time of the violation provided "fair warning" that a defendant's conduct was

prohibited by federal law or the Constitution. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* Courts may address the questions—whether rights were violated and whether the rights were "clearly established"—in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The Court already has found that, on the facts alleged in the complaint, Mr. White's First Amendment rights were violated. Qualified immunity will not shield the individual defendants if those rights were also clearly established at the time of the violation. *Fikes* presents facts that are fundamentally similar to those alleged by Mr. White and demonstrates that Mr. White's First Amendment rights were clearly established well in advance of his termination from the Athens Police Department.

As recounted by the Eleventh Circuit, Officer Fikes worked for the City of Daphne's police department and was present when another officer was ordered to

break off a high-speed pursuit because it posed a danger to bystanders. *Fikes*, 79 F.3d at 1080–81, 1085. The officer continued the pursuit, and four people were killed as a result. *Id.* at 1081. Officer Fikes reported the officer's conduct to Daphne's chief of police and the Alabama Bureau of Investigation (ABI). *Id.* Later, Officer Fikes observed a different officer making improper use of seized property and reported the incident to the ABI. *Id.* Officer Fikes conducted an independent investigation of misconduct in the Daphne Police Department, despite his chief's instructions to the contrary, and "reported his findings to 'other appropriate authorities,' including the ABI." *Id.* When the chief learned of the reports made by Officer Fikes, the chief developed and implemented a strategy to have Fikes fired on pretextual grounds. *Id.*

Officer Fikes brought federal and state claims against the City of Daphne, city officials, and members of the police department. *Id.* at 1080. The district court dismissed Officer Fikes's federal causes of action for failure to state a claim and remanded the state claims. *Id.* at 1083. Officer Fikes appealed the dismissal of his § 1983 action for violation of his First Amendment rights. *Id.* The Eleventh Circuit held that Officer Fikes had stated a cognizable claim under § 1983. *Id.* at 1085. Given the strong similarities between *Fikes* and the facts alleged by Mr. White, a reasonable person in the individual defendants' positions would have known that discharging Mr. White for speaking out about corruption in the Athens

24

Police Department violated the First Amendment.  At this stage, Mr. White has alleged facts sufficient to state a claim for First Amendment retaliation and overcome the individual defendants' assertions of qualified immunity.

## B. Civil Conspiracy Under Alabama Law

Mr. White alleges the individuals defendants engaged in a civil conspiracy under Alabama law "to terminate Plaintiff" in violation of Mr. White's First Amendment rights, 18 U.S.C. § 1708, 18 U.S.C. § 1512, Ala. Code § 13A-10-129, Ala. Code § 13A-4-2, and Ala. Code § 13A-4-3.  (Doc. 25, ¶¶ 120–21, 132–33, 139–41).  The individual defendants contend that the conspiracy claim is barred by the intracorporate conspiracy doctrine.  (Doc. 31, pp. 25–32).

"[T]he intracorporate-conspiracy doctrine holds that a corporation may not be held liable for any alleged conspiracy with its own employees or agents . . . ." *M & F Bank v. First Am. Title Ins. Co.*, 144 So. 3d 222, 234 (Ala. 2013) (citing *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010); *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)).  The intracorporate conspiracy doctrine also dictates that the employees of a corporation, "when acting in the scope of their employment, cannot conspire among themselves."  *Grider*, 618 F.3d at 1261.  The doctrine developed out of basic agency principles that attribute the actions of a corporation's agents to the corporation itself, which negates "the multiplicity of actors necessary for the

formation of a conspiracy." *McAndrew*, 206 F.3d at 1036.  The intracorporate conspiracy doctrine applies only to civil causes of action.  *Id.* at 1035 ("This outcome flows from the long-established conclusion that the intracorporate conspiracy doctrine does not apply to criminal conspiracies.").

Mr. White attempts to avoid application of the intracorporate conspiracy doctrine by arguing that "[n]owhere does Alabama law explicitly or implicitly extend the doctrine to public entities."  (Doc. 33, p. 22).  "Where the highest state court has not provided the definitive answer to a question of state law, [the Court] must predict how the highest court would decide this case, looking to the decisions of the lower state courts for guidance."  *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1287 (11th Cir. 2015) (internal quotation marks omitted).  In this instance, the Court has little difficulty concluding that, if presented directly with the issue, the Alabama Supreme Court would hold that the intracorporate conspiracy doctrine applies to public entities.  *See McClendon v. City of Sumiton*, Ala., No. 2:14-CV-00150-AKK, 2015 WL 2354187, at *10 (N.D. Ala. May 15, 2015); *Vestavia Plaza, LLC v. City of Vestavia Hills, Ala.*, No. 2:11-CV-4152-TMP, 2013 WL 4804196, at *12-13 (N.D. Ala. Sept. 9, 2013).

Both of the Eleventh Circuit cases that the Alabama Supreme Court cited when it adopted the intracorporate conspiracy doctrine discuss the application of the doctrine to public entities.  *Grider*, 618 F.3d at 1261 ("The doctrine applies to

public entities such as the City and its personnel."); *McAndrew*, 206 F.3d at 1038 ("Recently, in *Dickerson v. Alachua County Comm'n*, 200 F.3d 761 (11th Cir. 2000), a panel of this Court followed *Chambliss* and held that the intracorporate conspiracy doctrine barred plaintiff's § 1985(3) claim alleging a conspiracy among employees of the same public entity to deprive him of his civil rights.").  Basic agency principles also weigh in favor of applying the intracorporate conspiracy doctrine to municipal corporations, as well as private corporations, because the acts of public employees may be attributed to their employers.  *See* 63 C.J.S. Municipal Corporations § 894 ("Vicarious liability is a primary basis for liability on the part of public entities and flows from the responsibility of such an entity for the acts of its employees under the principle of respondeat superior.").  The Court will apply the intracorporate conspiracy doctrine to the claims raised by Mr. White.

The individual defendants are all employed by the City of Athens.  (Doc. 25, ¶¶ 7–11).  Chief Johnson, Captain Harrison, Chief Harper, and Lieutenant Harris served as superior officers to Mr. White, who achieved the rank of sergeant before he was terminated.  (Doc. 25, ¶¶ 7–11, 15).  As the Athens City Council President, and later as Mayor, Mayor Marks was involved in the supervision of City personnel, including Mr. White.  (Doc. 25, ¶¶ 35, 37, 38–39, 78, 94).  The First Amendment retaliation described by Mr. White is comprised of personnel actions and official discipline, including removal from an honorary position, an

undesirable transfer, and termination.  (Doc. 25, ¶¶ 49, 53, 93).  According to the facts of the complaint, the individual defendants were all agents of the same legal entity and acting within the scope of their employment when they took the actions challenged by Mr. White.  Therefore, under the intracorporate conspiracy doctrine, the individual defendants were not capable of conspiring with one another.

The criminal conspiracy exception to the intracorporate conspiracy doctrine does not apply in this case because Mr. White is seeking redress for a constitutional tort, not a criminal act.   Although Mr. White alleges Captain Harrison violated 18 U.S.C. § 1708 by taking mail from a mail carrier and 18 U.S.C. § 1512 by destroying a document to obstruct an official proceeding, Mr. White does not allege that the individual defendants conspired to commit these crimes.  (Doc. 25, ¶¶ 130–32).  Similarly, Mr. White's claim that Captain Harrison violated Ala. Code § 13A-10-129 by tampering with physical evidence does not satisfy the elements of a criminal conspiracy under Ala. Code § 13A-4-3 or an attempted criminal conspiracy under Ala. Code § 13A-4-2, if such an offense exists.  (Doc. 25, ¶ 139).  Even if Mr. White had alleged facts that showed the individual defendants conspired with Captain Harrison to prevent the prosecution of an individual arrested for a DUI, Mr. White would have failed to state a claim for a civil conspiracy under Alabama law.

Ultimately, Mr. White does not seek redress for the illegal conduct of Captain Harrison or any other member of the Athens Police Department.  Instead, Mr. White's causes of action are based on retaliation for his discussion of illegal conduct by police officers with the media and Mr. White's superior officers. Taking the allegations in the complaint as true, Mr. White's termination may have been improper, but it was not criminal.  Accordingly, the criminal conspiracy exception to the intracorporate conspiracy doctrine does not apply, and Mr. White's civil conspiracy claims under Alabama law are due to be dismissed.

### C. Conspiracy in Violation of 42 U.S.C. § 1985

The parties agree that Mr. White's conspiracy claim under 42 U.S.C. § 1985 is due to be dismissed because Mr. White has not alleged that he was subject to race- or class-based discrimination.  (Doc. 31, pp. 32–33; Doc. 33, p. 23); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) ("Our precedents establish that in order to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must show, *inter alia*, (1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment.") (footnote, quotation marks, and citations omitted) (alteration in original).

## V.     Conclusion

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** the defendants' motion to dismiss.  (Doc. 30).  The Court **DISMISSES WITHOUT PREJUDICE** Counts II–V in the amended complaint. (Doc. 25).  Mr. White may proceed with Count I of the amended complaint against the City on the chief policymaker theory and against the individual defendants.

**DONE** and **ORDERED** this March 4, 2016.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE