UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JASON A. WHITE, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.: 5:14-cv-00445-MHH |
| | } | |
| CITY OF ATHENS, WILLIAM R. MARKS, FLOYD JOHNSON, TRACY HARRISON, REED WAYNE HARPER, and TREVOR HARRIS, | } } } } } } | |
| Defendants. | } | |

## MEMORANDUM OPINION

Former Athens police officer Jason White asserts claims under 42 U.S.C. § 1983 against the City of Athens, Alabama; the mayor of Athens; and several of Mr. White's former superior officers in the Athens Police Department. (Doc. 25, ¶¶ 6–11). Mr. White alleges that the defendants retaliated against him for speaking out against corruption within the department. (Doc. 25, pp. 17–20). Mr. White contends that the defendants' conduct violated his rights under the First Amendment. Pursuant to Federal Rule of Civil Procedure 56, the defendants ask the Court to enter judgment in their favor on Mr. White's claims. (Doc. 62). For

the reasons stated below, the Court grants the defendants' motion for summary judgment.

I. **SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

II. **BACKGROUND**

Viewing the evidence in the light most favorable to Mr. White, the record in this case indicates that the police department for the City of Athens consists of two

divisions: a division of patrol officers and a division of investigators. Mr. White began working for the Athens Police Department in 1999. He began as a patrol officer and was elevated to the rank of sergeant in 2005. (Doc. 57-1, pp. 37, 39). In 2007, Mr. White moved to the investigations division as a detective sergeant. (Doc. 57-1, pp. 37-40).

In 2009, Mr. White and at least one other investigator became concerned that some of the senior officers in the Athens Police Department might be engaged in misconduct. (Doc. 57-1, pp. 74-75). For example, while Mr. White was a narcotics investigator, a number of confidential informants reported that they had been "burned" (i.e. exposed to drug dealers as confidential informants) by someone within the Athens Police Department who the confidential informants called "Downtown." Mr. White deduced from the nature of the narcotics investigations that "Downtown" had to be at least a sergeant in the department. Mr. White and his co-investigator, Officer Greg Parnell, reported the situation to DEA agents in Huntsville. (Doc. 57-1, pp. 74-83).

There were other incidents that suggested to Mr. White that senior officers were engaged in misconduct. (Doc. 57-1, pp. 62-64, 67-68). One incident in particular prompted Mr. White and another investigator, Detective Sergeant Dustin Lansford, to take action. (Doc. 57-1, p. 52). A young officer, Jason Threet, conducted a traffic stop and arrested the driver, William Jeffers, because Mr.

Jeffers was intoxicated. Officer Threet brought Mr. Jeffers to the police precinct and completed a report in which he indicated that Mr. Jeffers should be charged with a DUI. (Doc. 57-4, p. 33). Copies of all such reports must be mailed to the Department of Public Safety in Montgomery, Alabama. (Doc. 57-4, pp. 33-34). Officer Threet placed the DUI report in the mail. (Doc. 57-4, p. 33).

A criminal defense lawyer in Athens called Captain Tracy Harrison about the arrest. (Doc. 57-1, pp. 59-60). The lawyer had represented Captain Harrison's son in a criminal matter but had not charged Captain Harrison for the services. (Doc. 57-4, p. 22). The lawyer asked Captain Harrison for help with the DUI case. Captain Harrison approached Officer Threet, and Officer Threet agreed to drop the case. (Doc. 57-1, pp. 60-61; Doc. 57-4, pp. 32-33). When Captain Harrison learned that Officer Threet already had placed the DUI report in the mail, he and Lieutenant Presnell got in a marked police car, pulled over the mail truck carrying the report, and retrieved the report from the mail carrier. (Doc. 57-1, pp. 52-53, 69; Doc. 57-4, p. 35). That report no longer exists. (Doc. 57-1, p. 53).[1]

The police department's records clerk told Detective Lansford about the incident. (Doc. 57-1, pp. 52-53). The clerk told Detective Lansford that Captain Harrison had erased the entry in the clerk's log pertaining to the DUI arrest. (Doc.

---

[1] Captain Harrison testified that he kept the report and gave it to investigators from the Alabama Attorney General's office. (Doc. 57-4, p. 38); see p. 5 below.

57-1, pp. 52, 60, 90). Detective Lansford reported the situation to Alabama's Office of the Attorney General. (Doc. 57-1, p. 91; Doc. 57-2, p. 45; Doc. 57-3, pp. 56-57, Doc. 57-4, p. 47). The Attorney General sent a team of investigators to the Athens Police Department to investigate the report. (Doc. 57-1, pp. 53-54, 58). Mr. White noticed the investigators around the department and asked Detective Lansford what they were investigating. (Doc. 57-1, pp. 57-58). Detective Lansford then informed Mr. White of Captain Harrison's efforts to erase the records of Mr. Jeffer's DUI arrest. (Doc. 57-1, p. 58).

Mr. White discussed the DUI incident with Holly Holman, a local news reporter. (Doc. 57-1, pp. 105-07, 109). He shared information about the incident with Ms. Holman because Detective Lansford told him that the AG's office was dropping its investigation, and Mr. White did not want the investigation to be "swept under the rug." (Doc. 57-1, pp. 111-12). In providing information to a reporter about an internal police matter, Mr. White violated the police department's policy that prohibited communication about confidential police business. (Doc. 57-1, pp. 109-10). Mr. White acted in the hope that a full investigation would cause the corruption in the Athens Police Department to stop. (Doc. 57-1, pp. 111-12, 119-20).

Ultimately, the Athens Police Department reinstated the DUI charges, and reprimanded Captain Harrison and Officer Threet. (Doc. 57-3, p. 53; Doc. 57-4,

pp. 43-44, 47).  Captain Harrison acknowledges that the attorney who contacted him to ask for help on the Jeffers DUI had been providing free legal services to his son; that he (Captain Harrison) spoke to Officer Threet and asked if Officer Threet would be willing to drop the Jeffers DUI charge; and that he (Captain Harrison) and Lieutenant Presnell pursued and stopped a mail carrier to retrieve from the mail carrier a form addressed to the Alabama Department of Public Safety that contained evidence of the DUI arrest.  (Doc. 57-4, pp. 33-35).  Captain Harrison does not believe that he deserved the reprimand that he received for his efforts to help Mr. Jeffers avoid the DUI charge.  (Doc. 57-4, pp. 48, 52).  Rather, Captain Harrison believes that the person who told the press about the handling of the DUI charge bore responsibility for the embarrassment that the situation brought to the police department.  (Doc. 57-4, p. 52).

Following the investigations of the DUI incident, "a lot of things [] happened" that made work at the Athens police department "miserable" for Mr. White and Detective Lansford.  (Doc. 57-1, p. 122).  Detective Lansford thought about taking a different job to get away from the department.  (Doc. 57-1, p. 122).  Chief Harper removed Mr. White as supervisor of the department's honor guard and replaced him with Lieutenant Harris, who, at the time, "was not part of the

honor guard." (Doc. 57-1, pp. 124, 127).[2] Mr. White then stepped down from the honor guard. (Doc. 57-1, p. 125-26). Chief Harper also moved Mr. White from investigations to patrol. (Doc. 57-1, pp. 128-29). Mr. White believes these actions were retaliatory because his supervisory role in the honor guard was of great personal importance to him, and his transfer from investigations to patrol resulted in diminished on-call pay. (Doc. 65, pp. 11-12). Mr. White believes that his superior officers suspected that he had spoken with Ms. Holman about the involvement of Athens police officers in Mr. Jeffers's DUI incident. (Doc. 57-1, pp. 209-212).

On May 1, 2012, Mr. White was fired from the Athens Police Department. Mr. White asserts that this was a final act of retaliation against him for exposing corruption within the department. By contrast, the defendants contend that Mr. White's suspension from the Alabama Criminal Justice Information Center (ACJIC) database was the actual reason the police department chose to terminate him. "ACJIC is a state-run law enforcement agency that maintains data for use by law enforcement agencies and police departments in the State of Alabama." (Doc. 63, p. 2). In April 2012, Mr. White lost his privilege to access this database after an investigation by the ACJIC determined that he had used the system for unauthorized purposes. In April 2011, Mr. White's ex-wife, Sheree Wisdom, had

---

[2] Mr. White acknowledges that Lieutenant Harris previously had participated in the honor guard. (Doc. 57-1, pp. 126-27).

complained to Athens Police Department that Mr. White had been using his data base access to investigate her, her then-husband, and their friends. (Doc. 57-1, pp. 184-85). Defendants Harrison, Harris, and Harper were present when Ms. Wisdom made her complaint about Mr. White's conduct. (Doc. 57-7, p. 10). Ms. Wisdom acknowledges that while she was at the station, she discussed Holly Holman with the defendants. But Ms. Wisdom claims that she brought up Mr. White's connection to Ms. Holman and that this brief exchange occurred after she had discussed her complaint. (Doc. 57-7, pp. 21-22).

Both the Athens Police Department and the ACJIC investigated Ms. Wisdom's allegations against Mr. White. (Doc. 57-9, pp. 12-13). The ACJIC determined that Mr. White's use of the database was unauthorized. As a penalty, ACJIC suspended Mr. White's access to the database for six months and restricted his access for six months thereafter. (Doc. 57-1, pp. 187-88). After the police department received notice of Mr. White's ACJIC suspension, Chief Johnson recommended that Mr. White's employment with the Athens Police Department be terminated, and Mayor Marks approved that decision. (Doc. 57-2, pp. 26-27). Mr. White appealed the decision, but the Athens City Council accepted the recommendation of Mayor Marks and Chief Johnson. (Doc. 57-2, pp. 29-31).

Mr. White claims that his termination was not a necessary consequence of his ACJIC suspension. During his suspension, Mr. White believes he could have

continued his service to the department as an evidence technician or a crime scene investigator, though he admits that neither position formally existed within the department. (Doc. 57-1, pp. 191-195). According to Captain Harrison, ACJIC certification was a job requirement for all Athens City police officers, and Mayor Marks testified that the city had no available alternative position fitting Mr. White's qualifications when the city fired Mr. White. (*See* Doc. 57-9, pp. 11-12; Doc. 57-2, pp. 23-24).

Mr. White contends that other officers within the Athens Police Department used the ACJIC database for non-authorized purposes and that the police department did not impose similar sanctions. (Doc. 57-1, pp. 171-73; Doc. 65, p. 8). Mr. White acknowledges, though, that he cannot identify an instance in which a similar misuse of the database resulted in a report of misconduct or a suspension from the database. (Doc. 57-1, p. 242). Finally, Mr. White asserts that officers who had committed other serious offenses faced less serious penalties than he faced. (Doc. 65, p. 8). Officers Presnell and Threet, both of whom were involved in the Jeffers DUI incident, have since been promoted within the department. (Doc. 57-5, pp. 70-71). Taken together, Mr. White believes that these facts indicate that the real reason for his termination was not his ACJIC suspension, but his conversations with Ms. Holman.

## III. DISCUSSION

### A. Individual defendants

Mr. White alleges that defendants Mayor Marks, Chief Harper, Chief Johnson, Captain Harris, and Captain Harrison violated his First Amendment rights by removing him as supervisor of the Honor Guard, transferring him from the investigations unit to patrol, and ultimately terminating his employment in retaliation for speaking with Ms. Holman about corruption within the police department. (Doc. 25). The defendants argue that they are immune to Mr. White's claims. (Docs. 63, 68). The Court agrees.

Under the doctrine of qualified immunity, public officials performing discretionary functions are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[3] A right is clearly established when its "contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739 (citation and internal quotation marks omitted); *see also Hartwell v. City of Montgomery, Al.*, 487 F. Supp. 2d 1313, 1330 (M.D. Ala. 2007). For a

---

[3] It is undisputed that the defendants were performing discretionary functions when they removed Mr. White as supervisor of the Honor Guard, transferred Mr. White from the investigations unit to patrol, and ultimately terminated Mr. White's employment.

public official to be liable for an unconstitutional act, "the unlawfulness [of the act] must be apparent" under pre-existing law. *See Hope*, 536 U.S. at 740.

The standard in the Eleventh Circuit for determining whether a public official is entitled to qualified immunity formerly was "more rigorous." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004). But in *Hope*, the Supreme Court rejected the Eleventh Circuit's "rigid gloss on the qualified immunity standard." *Hope*, 536 U.S. at 739. The Supreme Court made clear that "the salient question" is not whether "fundamentally similar" or "materially similar" case law exists to compel the conclusion that a given act violates the Constitution, but whether the state of the law at the time of the alleged misconduct gave the defendants "fair warning" that their actions were unconstitutional. *See Hope*, 536 U.S. at 739, 741; *see also Holloman*, 370 F.3d at 1278.

At the time of the defendants' alleged misconduct, the law required, as it still does, courts to use a balancing test to evaluate a public employee's claim that he was retaliated against for exercising his right to free speech. The *Pickering* balance, as it is known, requires an employee to show (1) that "the employee's speech is on a matter of public concern," (2) that "the employee's first amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it performs through its employees," and (3) that "the employee's speech played a 'substantial

11

part' in the employer's decision to demote or discharge the employee." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1288 (11th Cir. 2000). If the employee makes all three showings, then the employer must show that (4) it would have made the same decision "even in the absence of the protected conduct." *Id.*; *see also Bryson v. City of Waycross*, 888 F.2d 1562, 1565–66 (11th Cir. 1989) (quoting *Pickering v. Bd. of Educ. of Twp. of High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568 (1968)).

The *Pickering* balance is fact-intensive, and "[t]here is no bright-line standard" to determine when a constitutional violation has occurred. *See Stanley*, 219 F.3d at 1289. Because of the case-by-case nature of the analysis, the Eleventh Circuit recognized, before *Hope*, that "'only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights.'" *Stanley*, 219 F.3d at 1298 (quoting *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994) (internal quotation marks omitted). The consensus in the Eleventh Circuit before *Hope* was that an "employer [wa]s entitled to [qualified] immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Stanley*, 219 F.3d at 1298 (quoting *Dartland v. Metro. Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989)).

The extent to which *Hope* has displaced this formulation of qualified immunity with respect to claims of First Amendment retaliation is unclear. *Hope* involved a claim of cruel and unusual punishment under the Eighth Amendment and required a constitutional inquiry less fact-dependent than the *Pickering* balance. Courts in the Eleventh Circuit have been "cautious in applying . . . pre-*Hope* authority . . . in qualified immunity cases." *See Hartwell*, 487 F. Supp. 2d at 1331. The district court in *Hartwell*, for example, applied "the *Hope* standard alone" to a plaintiff's claim of First Amendment retaliation. *Hartwell*, 487 F. Supp. 2d at 1330–31. The Court agrees with this approach.

Under *Hope*, the Court finds that the contours of the law with respect to Mr. White's First Amendment retaliation claim were not sufficiently clear at the time of the defendants' alleged misconduct to give the defendants fair warning that what they were doing violated Mr. White's constitutional rights. It should be obvious to a reasonable officer that Mr. White's speech touched upon a matter of public concern, but the fact-intensive nature of the *Pickering* balance permits "'officers of reasonable competence [to] disagree on th[e] issue'" of whether Mr. White's interest in exposing corruption within the police department outweighed the department's interest in promoting the efficiency of its police services and the department's established policy that prohibited communication about confidential police business. *Hope*, 536 U.S. at 752 (Thomas, J., joined by Rehnquist and

Scalia, JJ., dissenting) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Mr. White has made no showing that the police department did not have a legitimate interest in prohibiting the discussion of confidential police business.

Therefore, because the Court cannot find that the unlawfulness of the defendants' challenged actions would have been apparent to a reasonable police officer in the defendants' circumstances or that disputed questions of fact exist in this regard, the Court concludes that the individual defendants are entitled to qualified immunity from Mr. White's claims. *See Hope*, 536 U.S. at 740; *see also Brannon v. Finkelstein*, 754 F.3d 1269, 1278 (11th Cir. 2014) (noting, after *Hope*, that a defendant in the context of a First Amendment retaliation claim "will only rarely be on notice that his actions are unlawful because applying the *Pickering* balancing involves legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules") (citation and internal quotation marks omitted).

### B. The City of Athens

To hold the City of Athens liable for the acts of its officials, Mr. White must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). In addition, Mr. White must "identify those

officials who speak with final policymaking authority for [the city] concerning the act alleged to have caused the particular constitutional violation in issue." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003). If a municipal official's decisions "are subject to meaningful administrative review," then that official "does not have final policymaking authority" with respect to those decisions. *See Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997).

Mr. White contends that Chief Johnson recommended his termination and that Mayor Marks approved Chief Johnson's recommendation. (Doc. 25, ¶¶ 92, 94; *see also* Doc. 41, p. 21). The city has provided undisputed evidence that Chief Johnson's and Mayor Marks's decisions were subject to final review by the Athens City Council. (Doc. 63, pp. 13–14) (citing City of Athens, Alabama, Code of Ordinances § 6.23.5).[4] Accordingly, Mr. White has not identified city officials who speak with final policymaking authority for the city, and the city is entitled to judgment as a matter of law on Mr. White's claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** the defendants' motion for summary judgment. (Doc. 62). The Court will enter a separate order consistent with this memorandum opinion.

---

[4] In his response brief, Mr. White does not contend that Chief Johnson or Mayor Marks had final policymaking authority over the decision to terminate his employment. Instead, Mr. White argues that the city "has a pattern or practice . . . of not equally investigating allegations of misconduct or equally enforcing policies." (Doc. 65, p. 19). The Court dismissed Mr. White's "pattern or practice" theory at the Rule 12(b)(6) stage of this action. (Doc. 41, pp. 20, 30).

**DONE** and **ORDERED** this September 22, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE